**Antonio URENA, Plaintiff–Appellant,**

v.

**The BIRO MANUFACTURING COMPANY, now known as Island Leasing Company, Defendant–Third–Party–Plaintiff–Appellee,**

**564 Grocery, Inc., also known as C–Town Supermarket, Third–Party–Defendant,**

**Devo Food Corporation, doing business as Fine Fare Supermarket, Third–Party–Defendant–Counter–Claimant.**

No. 1079, Docket 96–7925.

United States Court of Appeals, Second Circuit.

Argued Feb. 7, 1997.

Decided May 23, 1997.

David B. Horowitz, New York City (Nason & Cohen, P.C., of counsel), for Plaintiff–Appellant.

Kenneth Moran, New York City (Frank V. Pesce, Ayers & Thompson; Mark E. Gebauer, McGuire, Woods, Battle & Boothe, Richmond, VA, of counsel), for Defendant–Appellee.

Before OAKES and WINTER, Circuit Judges, and SAND,* District Judge.

OAKES, Senior Circuit Judge:

Antonio Urena appeals from a judgment entered June 28, 1996, in the United States District Court for the Southern District of New York, Robert P. Patterson, *Judge,* dismissing his complaint, following the court's June 26, 1996, grant of The Biro Manufacturing Company's ("Biro") motion for summary judgment. Urena permanently injured the second and third fingers of his left hand while working with a Biro Model 33 meat cutting machine. His complaint, brought under theories of negligence and strict products liability, alleges Biro's liability based on design defect and failure to warn. On appeal, Urena asserts that the district court erred in granting Biro's motion for summary judgment because genuine issues of material fact remain unsettled. We agree, and thus reverse and remand.

# I

## Facts

In 1967, Biro designed and manufactured Model 33, an electrically-powered commercial band saw designed to cut meat for commercial and industrial use. The Model 33 has a rectangular steel base, upon which is mounted a table assembly consisting of a sliding front portion and a fixed rear component on which an adjustable meat gauge and saw head are installed. The saw is equipped with an upper and lower saw wheel around which is wrapped the band saw blade, which consists of a closed loop with teeth on one side. Both saw wheels are enclosed, the upper in the saw head and the lower in the cabinet below the saw table. When the power is on, the motor turns the lower wheel, which causes the blade to circulate around the lower and upper wheels; this rotation in turn causes the blade to move to provide the cutting action.

The Model 33 has a safety feature in the form of a blade guard, which covers the portion of the blade not needed for the cut. The guard can be adjusted up or down with a knob, depending on how much blade is required for a particular cut. With the guard in use, Biro asserts, an operator cannot cut himself with the guarded portion of the blade because the teeth of the saw are not exposed. Biro also asserts that the blade guard is an original part of the saw not designed to be removed. However, there was no such blade guard on the machine in question throughout the time Urena worked with the machine.

To operate the saw, the operator sets the meat gauge to correspond to the desired thickness of the cut. He then places the meat on top of the sliding table, pressing it against the meat gauge plate. The operator next adjusts the blade guard up or down to cover the unused portion of the blade, to a height dependent upon the height of the meat piece. With the saw turned on, the operator moves the moveable table from right to left, passing the meat through the saw and making the cut.

Unbeknownst to Urena, the Model 33 saw is supposed to be equipped with a removable "end cut" pusher plate ("safety plate"). The safety plate is a rectangular plastic block with a handle, which enables the operator to protect his hands from the lower portion of the exposed blade while cutting small pieces of meat. When the safety plate is used, it is designed to fit into a channel on the right side of the saw's moveable table. The safety plate cannot be used with large pieces of meat because it blocks their placement on the sliding table. Biro asserts that the safety plate is designed to be removable both because it interferes with the cutting of large pieces of meat and because it must be

* Honorable Leonard B. Sand, of the United States District Court for the Southern District of New York, sitting by designation.

cleaned frequently in order to avoid food contamination. The saw does, however, contain a bracket on the side, below the table, which is designed to hold the safety plate when it is not in use. The district court found that the safety plate is designed to be held with the right hand, as it is positioned on the right vertical edge of the saw's table when in use, and that its absence could not have been a cause of the accident, which was to Urena's left hand.

Urena, who at the time had ten years of experience as a butcher in Santo Domingo but who had never cut pig's feet, had been employed for one month at the C–Town Supermarket in the Bronx on October 13, 1993, when the accident occurred. C–Town was owned by Devo Food Corporation ("Devo"). Urena testified that the saw motor had been periodically stopping without notice and restarting during the entire month that he had been working at C–Town.[1] He had been using the saw off and on that day since approximately 8 a.m., for a total of perhaps two hours. The saw's blade guard was missing from the machine, leaving approximately one and one-half feet of exposed blade. Around 4 p.m., Urena began to cut pig's feet lengthwise. He did this by feeding a five-inch long, two and one-half inch wide, two and one-half inch high pig's foot into the blade until the cut was halfway made. While the machine was still running and the blade still moving, Urena reached with his left hand to pull the pig's foot through the blade to complete the cut. He claims that at this point, the blade stopped running, then restarted, causing the pork foot to slide to the right and his left hand to hit the toothless side of the blade, resulting in injury to the second and third fingers of that hand.

Urena filed a complaint in the Southern District of New York on September 13, 1995, suing under negligence and strict products liability. His products liability case takes two forms: First, he argues that Biro's failure to include adequate warnings and instructions with Model 33 subjects Biro to strict liability; second, he asserts that the removability of the safety plate was a design defect. *See Voss v. Black & Decker Mfg. Co.,*

59 N.Y.2d 102, 106–07, 463 N.Y.S.2d 398, 401, 450 N.E.2d 204, 207 (1983) (manufacturer of a product may be held strictly liable when product causes injury under three theories: defective manufacture, defective design, and failure to warn). The district court assumed diversity jurisdiction pursuant to 28 U.S.C. § 1332. Biro filed a third-party complaint against Devo on November 14, 1995; Devo subsequently counterclaimed on December 29, 1995. After extensive discovery had been conducted, Biro filed its motion for summary judgment on May 3, 1996. Unrecorded oral argument on the motion was held on May 24, 1996; Judge Patterson later granted the motion on June 26 and dismissed Urena's complaint on June 28, 1996.

■ On July 26, 1996, Urena filed timely notice of appeal. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291, and review a grant of summary judgment *de novo. Gallien v. Connecticut Gen. Life Ins. Co.,* 49 F.3d 878, 881 (2d Cir.1995).

## II

### Discussion

A party is entitled to summary judgment when the pleadings, affidavits and evidence show that there is no genuine issue as to any material facts such that the moving party is entitled to judgment as a matter of law. *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991). Once the moving party has met its burden to show that there is no genuine issue of material fact, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), the party opposing the motion has the burden to show specific facts proving there is a genuine issue remaining for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Urena claims that the district court's grant of Biro's motion for summary judgment was improper because, after viewing the facts in the light most favorable to Urena, several genuine issues of material fact remain. Fed.R.Civ.P. 56(c); *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

---

1. His claim is bolstered by the fact that the saw was never available for inspection by either party's experts: according to C–Town, the saw was discarded soon after Urena's injury because the motor burned out.

## A. Design Defect

■ Urena's first strict liability theory is that Model 33 was defectively designed. Under New York's strict product liability law, the manufacturer of a defective product is liable to an injured or damaged person if:

(1) the product is "defective" because it is not reasonably safe as marketed; (2) the product was used for a normal purpose; (3) the defect was a substantial factor in causing the plaintiff's injuries; (4) the plaintiff by the exercise of reasonable care would not have both discovered the defect and apprehended its danger; (5) the plaintiff would not have otherwise avoided the injury by the exercise of ordinary care.

*Fane v. Zimmer, Inc.*, 927 F.2d 124, 128 (2d Cir.1991) (citing *Wolfgruber v. Upjohn Co.*, 72 A.D.2d 59, 62, 423 N.Y.S.2d 95, 97 (4th Dep't 1979), *aff'd*, 52 N.Y.2d 768, 436 N.Y.S.2d 614, 417 N.E.2d 1002 (1980)). *Robinson v. Reed–Prentice Div. of Package Mach. Co.*, 49 N.Y.2d 471, 479, 426 N.Y.S.2d 717, 720, 403 N.E.2d 440, 443 (1980) explained:

Where a product presents an unreasonable risk of harm, notwithstanding that it was meticulously made according to detailed plans and specifications, it is said to be defectively designed.... [S]ome products, [however,] for example knives, must by their very nature be dangerous in order to be functional. Thus, a defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce. Design defects, then, unlike manufacturing defects, involve products made in the precise manner intended by the manufacturer. Since no product may be completely accident proof, the ultimate question in determining whether an article is defectively designed involves a balancing of the likelihood of harm against the burden of taking precaution against that harm.

*Id.* (citing, *inter alia*, Restatement (Second) of Torts § 402A; *Micallef v. Miehle Co., Div.* of *Miehle–Goss Dexter, Inc.*, 39 N.Y.2d 376, 386, 384 N.Y.S.2d 115, 121, 348 N.E.2d 571, 577 (1976)) (other citations omitted).

The district court granted summary judgment because it found that, even had the safety plate been available to be used as intended, it was meant to protect the operator's right hand, not the left hand; furthermore, it found that Urena failed to provide adequate proof of available alternative designs. The court's decision thereby addressed the issues of causation and unreasonable danger. We likewise address each in turn.

### 1. Causation

■ Urena presented several pieces of evidence which create a reasonably disputed issue of fact as to whether the defect (i.e., the removability of the safety plate) was a substantial cause of his injury. His theory is that the safety plate, if available for his use, would have protected his left hand, because it would not have been necessary to place his left hand near the blade to pull the meat through if he had been using the safety plate to stabilize and push the meat through the blade. This theory is supported by several distinct facts in evidence. First, the safety plate was shown to create a safety barrier between the operator's hands and the lower portion of the exposed saw blade. Second, and this we must emphasize, the safety plate has small conical protrusions which hold and stabilize the meat and prevent it from slipping while the meat is being cut. Third, both Biro's operating manual and its personal representative have indicated that the safety plate was designed to protect both of the operator's hands, not only the right hand. Richard C. Biro, President of Biro, admitted that the safety plate "protects an operator's *hands* from contacting the blade." Biro Aff., April 24, 1996, at 3 (emphasis added). Mr. Biro later attested twice that the plate "keep[s] the operator's *hands* away from the close [proximity] of the blade." Biro Aff., April 12, 1996, at 17, 39 (emphasis added). The operating manual for the Model 33 asserts that the safety plate "insures safety and prevents injury to *hands*." (A90) (emphasis added). In other words, an inference

can be drawn that Biro expected the safety plate to protect against injury to both hands, that the plate did in fact protect against injury to both hands, and that if the plate had been permanently attached to the machine, Urena's injury would not have occurred because his left hand would not have been in the path of the blade.

■ Biro argues that the lack of the blade guard was the cause of the injury rather than the lack of the safety plate.[2] Urena has rebutted that argument by attesting to his belief that the missing safety plate, not the missing blade guard, was the cause of his injury. He attested that "[t]he pusher plate would have held the pork foot while it was being cut and [he] would not have had to hold the pork foot with [the] fingers [of his left hand] near the cutting blade"; that "[t]he blade guard would not have provided protection below the height of the pork foot where the blade was working"; and that his "fingers got cut near the bottom of the blade approximately 1 and 1/2 inches above the table." Urena Aff., May 8, 1996, at 4–5.

Biro also argues that the injury was caused by the poor condition of the thirty-year-old saw, rather than the absence of the safety plate. Urena has presented a material issue of fact as to this aspect of causation: A reasonable jury could conclude either that the lack of a safety plate was, or was not, the cause of the injury because the plate would have, or would not have, protected Urena's hands against the danger caused by the unexpected stopping and restarting of the motor.

When all of the evidence is viewed in the light most favorable to Urena, it presents a case that, had the safety plate been used, both of Urena's hands might have been protected, because he would not have had to reach with his left hand to pull the pig's foot through the blade. Urena has thus provided sufficient evidence to withstand summary judgment on the question of causation.

**2.** Under New York law, "[a] manufacturer may not be cast in damages, either in a strict products liability or negligence cause of action, where, after the product leaves the possession and control of the manufacturer, there is a subsequent modification which 'substantially alters the prod-

### 2. *Unreasonable Danger*

■ A product is unreasonably dangerous if a reasonable person would conclude that the product's utility did not outweigh the risk inherent in marketing a product designed in that manner. *Voss*, 59 N.Y.2d 102, 463 N.Y.S.2d 398, 450 N.E.2d 204. The decision whether a product is unreasonably dangerous is one for the jury, which it may determine after taking into account alternative designs, their costs, and the product's usefulness. *Id.*, 59 N.Y.2d at 107, 463 N.Y.S.2d at 402, 450 N.E.2d at 208. The burden of presenting evidence that the product, as designed, presented a substantial likelihood of harm and could have been designed more safely, is with the plaintiff. *Id.*, 59 N.Y.2d at 108, 463 N.Y.S.2d at 402, 450 N.E.2d at 208. Inadequate warnings alone can make a product unsafe. *Fane*, 927 F.2d at 128 (citing *Baker v. St. Agnes Hosp.*, 70 A.D.2d 400, 405, 421 N.Y.S.2d 81, 85 (2d Dep't 1979)).

■ Urena provided evidence going to unreasonable danger. He claimed that Model 33 could not reasonably be considered safe because, while it did have a safety feature (the safety plate), Biro had purposefully manufactured it to be removable rather than permanent. This argument was supported by the testimony of Richard Biro, who stated that the safety plate was made removable in part because its use was not compatible with the cutting of large pieces of meat. In other words, Urena presented evidence showing that Biro knew that the safety plate would not necessarily be used when meat was being cut, and thus would not always be attached to the machine at the time the operator would begin to cut small pieces, or "end cuts," of meat. A jury could decide from this evidence that Biro took an unreasonable risk in marketing the machine without a permanently attached safety guard.

uct and is the proximate cause of the plaintiff's injuries.' " *Wyda v. Makita Elec. Works, Ltd.*, 648 N.Y.S.2d 154 (2d Dep't 1996) (quoting *Robinson*, 49 N.Y.2d at 475, 426 N.Y.S.2d at 718, 403 N.E.2d at 441).

Furthermore, Urena has made a sufficient showing that Biro failed to provide adequate instructions and warnings concerning the need to use the safety plate to cut small pieces of meat and bone. He asserts that Biro intended the machine to be used on some occasions without the safety plate, and that because the plate was removable, Biro ought to have given adequate instructions and warnings that it is necessary to use the safety plate when cutting small pieces in order to insure safety and protect the operator's hands. Again, Urena has provided evidence to support his claim. He has testified that the "machine ... had no instructions and no warnings." He has stated that, had he known that the machine provided a protective safety plate, he would have asked for it. He has attested that, had he known that he "was not supposed to use the machine to cut pork feet without a pusher plate, [he] would not have attempted to cut the pork foot."

As noted, the district court apparently believed that Urena could not prevail on Biro's motion for summary judgment in part because he had not shown adequate evidence of alternative designs. In response to Biro's motion for summary judgment, Urena provided an affidavit of John Clesca, a professional civil mechanical engineer. Mr. Clesca provided "expert" testimony concerning an alternative design for the safety plate and its connection to the machine. The district court held that the affidavit did not constitute an appropriate alternative design because it was not supported by a personal inspection of Model 33 or any studies of the feasibility of his proposal, and therefore further held that, because neither Urena's counsel nor Clesca had shown *either* "how the absence of a pusher plate was a proximate cause of Plaintiff's injury to his left hand [ ]or proposed an alternative design for the pusher plate meeting the standard for trial admissibility, he has failed to raise an issue of material fact as to the defect in design of the saw."[3]

The court indicated that Urena was required to provide evidence of alternative machine designs in order to rebut Biro's assertion that alternative designs incorporating a permanent safety plate were not feasible. We disagree. Though it is true that the plaintiff carries the burden of showing that an alternative design was feasible and safer, Urena has met that burden even without considering Clesca's testimony. He has provided testimony that Biro could have added a sticker or other warning to the machine which would have made clear to an operator the need to use the safety plate when cutting small pieces of meat such as pork feet.

Alternative design evidence is only one piece of the equation which a jury may take into account in determining whether the risk outweighed the utility of the product. This court had previously stated that "the New York Court of Appeals has been quite explicit ... in its warning to trial judges in products liability cases ... that 'the perception of the reasonable user ... as to the dangers which inhere' in a defective product is a question of fact to be submitted to the jury." *Merced v. Auto Pak Co.*, 533 F.2d 71 (2d Cir.1976) (citing *Bolm v. Triumph Corp.*, 33 N.Y.2d 151, 160, 350 N.Y.S.2d 644, 651, 305 N.E.2d 769, 774 (1973)). Urena's evidence that the Model 33 design was unreasonably dangerous because it lacks adequate warnings and instructions was unrebutted. He therefore survives summary judgment on his design defect claim.

**B. Failure to Warn**

 A plaintiff may recover in strict products liability for the manufacturer's failure to warn of the risks and dangers associated with the use of its product. *Polimeni v. Minolta Corp.*, 227 A.D.2d 64, 65–66, 653

**3.** The district court noted in a footnote that the affidavit was submitted in violation of a court discovery order and Fed.R.Civ.P. 26(a)(2), because Urena failed to disclose Clesca's identity or existence upon Biro's request prior to close of discovery. *See* Order at 8 n. 1, 1996 WL 361544, June 26, 1996. Yet, the court apparently nevertheless considered the affidavit when granting summary judgment. *Id.* at 7–8. We see no harm in the court's consideration of the affidavit upon remand for whatever weight it may carry. As for the admissibility of the expert's testimony in evidence before a jury, we leave that for the judge's further consideration, based upon whatever evidence is available to him.

N.Y.S.2d 429, 430 (3d Dep't 1997); *Bukowski v. CooperVision Inc.*, 185 A.D.2d 31, 592 N.Y.S.2d 807 (3d Dep't 1993). That duty generally extends to warning ultimate consumers of the dangers resulting from the foreseeable use of the product. *Bukowski*, 185 A.D.2d at 33, 592 N.Y.S.2d at 808. "The adequacy of the instruction or warning is generally a question of fact to be determined at trial and is not ordinarily susceptible to the drastic remedy of summary judgment." *Beyrle v. Finneron*, 199 A.D.2d 1022, 1023, 606 N.Y.S.2d 465, 466 (4th Dep't 1993); *Harrigan v. Super Products Corp., Dow & Co., Inc.*, — A.D.2d —, 654 N.Y.S.2d 503 (4th Dep't 1997). Biro failed to establish that it had no duty to warn or that the duty was discharged as a matter of law. *Cf. Alessandrini v. Weyerhauser Co.*, 207 A.D.2d 996, 617 N.Y.S.2d 101 (4th Dep't 1994). We agree with Urena that the reasonableness of Biro's inaction, if indeed there was such, is a question which presents a genuine issue of material fact which precludes summary judgment.

### C. Negligence

The district court did not address Urena's negligence claim independently from his strict products liability claims. We therefore instruct the court to reevaluate upon remand whether Urena has made out a case of negligence which survives summary judgment, taking into account our comments herein.

### Conclusion

Vacated and remanded.